IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

(1) KAZEM MOUSAVI,                              )
                                                )
       Plaintiff,                               )
                                                )
v.                                              )   Case No. 19-cv-00003-CVE-JFJ
                                                )
(1) JOHN CHRISTNER TRUCKING, LLC                )   **JURY TRIAL DEMANDED**
(2) THREE DIAMOND LEASING, LLC,                 )
                                                )
       Defendants.                              )
                                                )

## COMPLAINT

      Kazem Mousavi through his attorneys of record, Crowe & Dunlevy, presents claims for monetary damages.

## INTRODUCTION

      1.    Plaintiff Kazem Mousavi ("Mousavi") began working as a driver for Defendant John Christner Trucking, LLC ("JCT") in 2012. On April 6, 2017, JCT installed a camera in Mousavi's semi-truck without informing him that the camera would be recording the inside of his cab. The camera, unlike most cameras used to monitor the cabs of semis, was constantly recording Mousavi and accessible to multiple people at JCT. Eventually, an employee of JCT informed Mousavi that she had been listening to his conversations, stating that she loved listening to him speak in his native tongue. Mousavi, paranoid and anxious from his employer's blatant privacy invasion, asked his supervisor to remove the camera, but his supervisor refused. Mousavi returned to his home in California to see a doctor and informed JCT that he was not fit to drive due to the mental anguish he was experiencing from being surveilled. Knowing that Mousavi was unfit to drive, JCT asked him to return to the road. Approximately six days after

returning to the road, Mousavi tipped over his truck on a narrow road in rural Missouri. One week later, JCT fired him.

## IDENTIFICATION OF THE PARTIES

2. Plaintiff, Kazem Mousavi, is a citizen of and currently resides in the State of California.

3. On information and belief, Defendant John Christner Trucking, LLC, is a limited liability company, organized under Oklahoma law, whose members are all citizens of Oklahoma.

4. On information and belief, Defendant Three Diamond Leasing, LLC, is a limited liability company, organized under Oklahoma law, whose members are all citizens of Oklahoma.

## JURISDICTION AND VENUE

5. This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, which provides district courts with jurisdiction over civil actions arising under the United States Constitution or laws of the United States. The federal rights asserted by Plaintiff are enforceable under 42 U.S.C. § 1981 and 18 U.S.C. § 2520.

6. This court also has subject matter jurisdiction to adjudicate the supplemental state law claims that arose out of the same course of conduct giving rise to the principal claims of Plaintiff as stated below, pursuant to 28 U.S.C. § 1367.

7. Finally, this court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) as well because: (a) the amount in controversy exceeds $75,000, exclusive of interest and costs; and (b) there is complete diversity between Plaintiff and Defendants.

8. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the real and immediate harm sustained by Plaintiff occurred in this judicial district.

## FACTUAL ALLEGATIONS

9. On or about October 12, 2012, Mousavi commenced full-time employment as a semi-truck driver for JCT.

10. JCT offers its drivers a no-cash-down variable lease purchase program, where the driver's truck payment is based on the miles paid to the driver that week. JCT offers this through its sister company, Three Diamond Leasing, LLC.

11. On or about December 6, 2016, Mousavi signed a new independent contractor operating agreement with JCT and a new lease to own agreement with Three Diamond Leasing.

12. On or about April 6, 2017, John Mallory, an employee in JCT's safety department, and a personal friend of Mousavi, informed Mousavi that he was going to install a new camera in Mousavi's truck. Until this time, Mousavi had a camera in his truck that pointed away from the cab and would only record events that took place outside of the truck.

13. Mousavi objected to the installation because he did not want to be videotaped in the cab of his truck, nor did he want his conversations to be recorded, and he even threatened to quit if he was going to be surveilled.

14. Mr. Mallory assured Mousavi that the new camera would function exactly like the old one, in that Mousavi would not be recorded inside the cab of his truck; Mr. Mallory also assured Mousavi that the device would not capture, record, or store any audio.

15. Mousavi agreed to the installation of the new camera based on Mr. Mallory's assurances that the camera would not record any of his movements or conversations inside the cab of his truck.

16. On or about April 21, 2017, Mousavi was at JCT's Sapulpa, Oklahoma location, and an employee in the company's safety department, Javada Walker, informed Mousavi that she had

3

been watching him in his cab, listening to his phone conversations, and that she "loved listening to him in his native tongue."

17. The way in which Ms. Walker talked about Mousavi's conversations made him believe that she was watching him and listening to him regularly.

18. While Mousavi did not know this at the time, the device being used to record him was recording at all times and the video was being monitored regularly, which is not standard in the industry. Normally, recording devices used in semis contain an accelerometer that can measure sudden movements like rapid deceleration or other forces. And while the device is recording continuously, the video is only saved if there is a "triggering event," such as hard breaking, rapid acceleration, turns at excessive speed, etc. When a "triggering event" occurs, the device will typically save the video for a certain amount of time before and after the event. The amount of recording time varies but rarely exceeds thirty seconds on either side of the "triggering event." Thus, the device used to monitor Mousavi did not have any of the industry standard mechanisms typically used to limit invasions into the privacy of semi-truck drivers.

19. Mousavi was shocked to learn of this invasion of his privacy. He felt violated by his company and deceived by his friend, Mr. Mallory.

20. All of Mousavi's calls came through the Bluetooth in his truck, so the full audio from all of his calls was recorded.

21. Mousavi discussed the incident with his friend and JCT dispatcher, Rich Ates, and Mr. Ates told Mousavi that he would talk to Mr. Mallory and would have the recording device taken out the next day.

22. Mr. Ates approached Mr. Mallory about the device the next day, and Mr. Mallory replied by saying, "Shit! How did he find out? Did Javada tell him?"

4

23. Mousavi spoke with Mr. Mallory within a few days of discovering he was being surveilled, and he informed Mr. Malloy that he wanted the device to be taken out of his truck. But Mr. Malloy told Mousavi that the device could not be removed because Mr. Malloy's supervisor, Shannon Crowley, said it needed to stay in the truck for another four to six weeks.

24. Thinking that he could not be the only person being surveilled in a company with a fleet of over 100 drivers, Mousavi asked Mr. Ates if he was aware of any other drivers in the company who had a recording device in their trucks like the one Mousavi had, and Mr. Ates said, "No"; moreover, in the days after the accident, Mousavi examined multiple trucks on JCT's premises, and he did not see a single truck with a recording device similar to the one installed in his truck.

25. Mousavi is an American citizen of Iranian descent, and, on knowledge and belief, at the time of the accident, he was the only driver at JCT who was of Iranian descent.

26. On or about April 25, 2017, Mousavi returned to his residence in California, where he immediately visited his primary care physician because he was experiencing severe anxiety from discovering that he was being watched and listened to at all times while he was in his truck.

27. Mousavi informed JCT that he was not feeling well due to the incident.

28. Mousavi further informed JCT that he was not fit to drive, stating that the severe anxiety he was experiencing from the discovery of the recording device and his constant unease from JCT's perpetual surveillance left him apprehensive to keep driving.

29. After JCT informed Mousavi of his need to continue driving, he returned to the road on or about April 30, 2017.

30. JCT did not require Mousavi to be examined by a medical professional before he departed on the April 30 trip.

31. On or about May 5, 2017, Mousavi was driving down a narrow road in rural Missouri, when he dropped a tire off the side of the road. The shoulder was soft, and Mousavi lost control of his truck, ultimately tipping it over on the side of the road.

32. Mousavi passed separate drug and alcohol tests, which were administered immediately after the wreck.

33. JCT placed Mousavi on a 30 day suspension for the accident but terminated his employment approximately one week later.

34. The contract between Mousavi and JCT included a final accounting provision for an Escrow Fund that Mousavi would pay into weekly and JCT would subsequently use to pay expenses, taxes, fees, fines, penalties, damages, or other amounts paid, owed, or incurred by JCT. However, JCT never provided Mousavi with a final accounting of the Escrow Fund to let him know if there were any monies that rightfully belonged to him.

35. Mousavi was also required to carry physical damage insurance as part of his lease-to-own contract with Three Diamond.

36. Mousavi paid insurance on his truck from December 2016 until his wreck in May 2017.

37. On information and belief, Three Diamond received an insurance payment after the May 5 wreck that exceeded the amount that Mousavi owed on the truck.

38. Under the contract between Mousavi and Three Diamond, Three Diamond had a duty to provide Mousavi with an accounting upon termination of the lease, which Three Diamond never provided.

## COUNT I
### Electronic Communications Privacy Act
### 18 U.S.C. § 2520

39. Plaintiff incorporates by reference and re-alleges the information set forth in paragraphs 1-38.

40. At all relevant times herein, 18 U.S.C. § 2511(1)(a) prohibited the intentional interception of any electronic communications between two parties without the consent of one or both parties to that communication.

41. 18 U.S.C. § 2511 provides that "any person who—(a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication" shall be punished.

42. Defendants intentionally intercepted Mousavi's oral communications, i.e., his phone calls, without his consent, thereby violating § 2511(1)(a).

43. 18 U.S.C. § 2520(a) provides that "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity . . . which engaged in that violation such relief as may be appropriate."

44. 18 U.S.C. § 2520(b) provides that "[i]n an action under this section, appropriate relief include—(1) such preliminary and other equitable or declaratory relief as may be appropriate; (2) damages under subsection (c) and punitive damages in appropriate cases; and (3) reasonable attorney's fees and other litigation costs reasonably incurred."

45. Under 18 U.S.C. § 2520(c)(2), "the court may assess damages whichever is the greater of— (A) the sum of the actual damages suffered by the plaintiff and any profits made by the

violator as a result of the violation; or (B) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000."

46. By reason of the foregoing, as a result of Defendants' conduct described above, Mousavi is entitled to recover the maximum allowable statutory damages, punitive damages, and attorneys' fees and costs available under 18 U.S.C. § 2520.

## COUNT II
### Discrimination in Violation of 42 U.S.C. § 1981

47. Plaintiff incorporates by reference and re-alleges the information set forth in paragraphs 1-46.

48. Mousavi is an Iranian-American and has experienced discrimination because of his race and/or color, in violation of 42 U.S.C. § 1981.

49. Defendants treated Plaintiff differently than similarly situated white employees with respect to the terms of his employment. For instance, when employed, Mousavi was the only Iranian-American working at JCT and was also the only employee who was being surveilled.

50. Mousavi's race was a substantial or motivating factor in Defendants' disparate treatment of him.

51. JCT knew or should have known of the discrimination perpetrated by Mr. Mallory and/or his supervisor, Mr. Crowley.

52. As a direct and proximate result of Defendants' racially discriminatory employment practices, Mousavi has suffered loss of income, loss of career opportunity, and lost benefits.

## COUNT III
### Invasion of Right of Seclusion

53. Plaintiff incorporates by reference and re-alleges the information set forth in paragraphs 1-52.

54. The interception and disclosure of Mousavi's oral communications without his consent constituted an unauthorized invasion or prying upon Mousavi's seclusion.

55. This intrusion was offensive or objectionable to a reasonable person.

56. The matter upon which the intrusion occurred was private.

57. The intrusion caused anguish and suffering for Mousavi.

## COUNT IV
### Negligence

58. Plaintiff incorporates by reference and re-alleges the information set forth in paragraphs 1-57.

59. JCT is subject to the Federal Motor Carrier Safety Regulations.

60. Pursuant to 49 C.F.R. § 391.45(c), a motor carrier must require its drivers to be medically examined and deemed qualified to operate a commercial motor vehicle when "[a]ny driver whose ability to perform his/her normal duties has been impaired by a physical or mental injury or disease."

61. After Mousavi informed JCT that he could not perform his normal duties due to a mental injury, JCT had a duty to keep Plaintiff from driving until he passed a medical examination.

62. JCT breached this duty by asking and allowing Plaintiff to continue driving without requiring him to pass a medical examination.

63. JCT's actions were a violation of 49 C.F.R. § 391.45(c), which constitutes negligence per se.

64. The violation was the direct and proximate cause of Mousavi's May 5, 2017, wreck.

65. As a result of Defendant JCT's negligence per se, Mousavi incurred past, present, and future medical expenses from his injuries.

66. As a result of Defendant JCT's negligence per se, Mousavi endured past, present, and future loss of wages as well as other economic losses.

67. As a result of Defendant JCT's negligence per se, Mousavi suffered the loss of past, present, and future pain and suffering.

## COUNT V
### Breach of Contract of Defendant JCT

68. Plaintiff incorporates by reference and re-alleges the information set forth in paragraphs 1-67.

69. On or about December 12, 2016, Mousavi and JCT entered into a written employment agreement where Mousavi agreed to provide transportation related services in exchange for compensation.

70. Under the contract, JCT established and administered an Escrow Fund, to which Mousavi was required to submit a $1,000 principal payment and thereafter $25 per week.

71. Upon the termination of the employment agreement, the Escrow Fund was to be used to pay expenses, taxes, fees, fines, penalties, damages, or other amounts paid, owed, or incurred by JCT. If there was any money left after all those expenses were paid, Defendant JCT was required to return the balance to Mousavi. Defendant JCT was required to provide a final accounting to

Mousavi within forty-five (45) days from the date of termination, but Defendant JCT never did so.

72. Defendant JCT breached its contract with Mousavi by not providing a final accounting of the Escrow Fund.

73. Mousavi has suffered injury due to Defendant JCT's breach.

## COUNT VI
### Breach of Contract of Defendant Three Diamond

74. Plaintiff incorporates by reference and re-alleges the information set forth in paragraphs 1-73.

75. On or about December 6, 2016, Mousavi and Three Diamond entered into a written equipment lease agreement.

76. As part of the agreement, Mousavi was required to carry physical damage insurance.

77. Mousavi made insurance payments for approximately five months before his truck was totaled.

78. In the agreement, Three Diamond agreed to provide Mousavi with a final accounting upon termination of the lease, but it never did thus breaching the contract.

79. Upon information and belief, Three Diamond collected insurance payments in excess of what Mousavi owed on the truck, thus breaching the contract.

80. Mousavi has suffered injury due to Defendant Three Diamond's breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kazem Mousavi prays for the following relief:

1. damages from the above listed claims for a sum in excess of $75,000;

2.   punitive damages allowable by law;

3.   attorneys' fees pursuant to 18 U.S.C. § 2520(b) and 42 U.S.C. § 1988(b), or otherwise allowable by law;

4.   plaintiff's recoverable costs;

5.   and any further relief as the Court and jury deems just and equitable.

Respectfully submitted,

/s/ Craig W. Hoster
Craig W. Hoster, OBA # 4384

/s/ Deric J. McClellan
Deric J. McClellan, OBA # 32827

CROWE & DUNLEVY
A Professional Corporation
500 Kennedy Building
321 South Boston Avenue
Tulsa, OK 74103-3313
(918) 592-9800
(918) 592-9801 (Facsimile)
craig.hoster@crowedunlevy.com
deric.mcclellan@crowedunlevy.com
ATTORNEY FOR PLAINTIFF KAZEM MOUSAVI

3380072.10