**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KAZEM MOUSAVI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19-CV-0003-CVE-JFJ** |
| | ) | |
| **JOHN CHRISTNER TRUCKING, LLC and** | ) | |
| **THREE DIAMOND LEASING, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**OPINION AND ORDER**

Now before the Court is Defendant's Motion for Summary Judgment and Brief in Support (Dkt. # 71).  Defendants John Christner Trucking, LLC (JCT) and Three Diamond Leasing, LLC (Three Diamond) request summary judgment in their favor on all of plaintiff's claims and their counterclaims for breach of contract.  Dkt. # 71.  Plaintiff Kazem Mousavi responds that defendants falsely represented to him that a camera installed in his tractor-trailer would not record his voice, and defendants should be held liable under federal and state law for the severe emotional distress they caused him.  Dkt. # 88.  Plaintiff also argues that defendants are liable for breach of contract, because they refused to provide him a replacement vehicle or pay him insurance proceeds following an accident.  Id. at 23.  Defendants did not file a reply in support of the motion for summary judgment.

## I.

Mousavi began driving for JCT in October 2012 and he signed an independent contractor agreement.[1]  Dkt. # 71-2, at 3.  Mousavi signed a new independent contractor agreement in December 2016 and he signed a new lease agreement with Three Diamond for a 2017 Freightline tractor.  Dkt. # 71-2, at 4-5; Dkt. # 71-4.  On February 28, 2017, JCT received a quote from Omnitracs for the installation of a critical event camera in some of its trucks.  Dkt. # 71-5, at 2.  Shannon Crowley, JCT's vice president of risk management, testified in his deposition that the cameras were part of a pilot program that would be tested in five or six trucks for a 90 day period, and JCT would decide whether to implement the cameras fleet-wide after the trial period.  Id. at 3.  The cameras were designed to save footage of events thirty seconds before and after a critical event, such as hard braking or speeding.  Dkt. # 71, at 7; Dkt. # 88, at 7.  Mousavi correctly notes that this means that the cameras were always recording, because it would otherwise be impossible to record video footage of events that occurred 30 seconds before a critical event.  Dkt. # 88, at 7.  However, this also shows that Mousavi knew or should have known when the critical event camera was installed that it was constantly recording.

John Mallory, Mousavi's supervisor, was asked to find volunteers to participate in the program, and he approached Mousavi about placing a forward-facing critical event camera in his

---

[1]     The parties dispute whether Mousavi was an employee or independent contractor during his tenure with JCT.  Dkt. # 71, at 6; Dkt. # 88, at 7.  It is undisputed that Mousavi signed an independent contractor agreement, and there is a pending putative class action in which the plaintiffs, including Mousavi, are seeking a ruling that JCT's drivers are employees.  Thomas Huddleston et al. v. John Christner Trucking, LLC, 17-CV-549-GKF-FHM (N.D. Okla.).  The Court will not decide in this case whether plaintiff was improperly classified as an independent contractor, and the Court will stay further proceedings in this case if it becomes necessary to resolve the issue of plaintiff's status as an employee or independent contractor.

truck.  Dkt. # 71-6, at 4.  Mallory claims that Mousavi did not express any reservations about installing the camera in his truck, and he does not recall Mousavi asking about whether the camera recorded audio as well as video.  Id.  Mallory testified that one other driver volunteered to have a camera installed, and a camera was installed in Mousavi's truck around April 6, 2017.  Id. at 7-8. Mousavi disputes that he voluntarily agreed to have a camera installed in his truck and he claims that Mallory "pushed" him to allow JCT to install the critical event camera.  Dkt. # 88, at 74.  Mousavi testified in his deposition that he asked if the camera could record video or audio inside the truck, and Mallory advised Mousavi that the camera could only record video outside the truck.  Id. at 75. Prior to the installation of the Omnitracs camera, Mousavi had installed his own video camera that recorded outside his truck in the event he was involved in an accident.  Dkt. # 71-2, at 8.

Mallory reviewed any footage that was recorded when a truck had a critical event that triggered the camera, and he would receive an e-mail notifying him that a critical event had occurred. Dkt. # 71-5, at 7; Dkt. # 71-6, at 10.  Mallory received three videos captured from the camera in Mousavi's truck during the remainder of Mousavi's time driving for JCT, including two speeding alerts and an accident on May 5, 2017.  Dkt. # 71-6, at 11.  Mallory heard Mousavi's voice on one of the recordings and Mousavi was speaking Farsi.  Id. at 12.  Javada Walker, an employee of JCT, walked into Mallory's office while he was reviewing footage from the critical event camera, and she heard Mousavi speaking Farsi.  Dkt. # 71-6, at 14-15; Dkt. # 71-7, at 2.  Walker testified in her deposition that she regularly went in and out of Mallory's office, and she heard Mousavi's voice for a few seconds on one occasion.  Dkt. # 71-7, at 2.  Walker encountered Mousavi after she heard his voice on Mallory's computer, and Mousavi recalls that Walker said "it's funny that they can hear you."  Dkt. # 88, at 78.  There is no evidence suggesting that anyone at JCT could speak Farsi or that

Walker heard Mousavi's voice more than one time.[2]  Mousavi was upset that the camera recorded audio inside his truck and he asked Mallory to remove the camera.  Dkt. # 71-6, at 17; Dkt. # 88, at 81.  Mallory does not recall that Mousavi seemed upset when he made the request for removal of the camera.  Dkt. # 71-6, at 20.  Crowley did not agree to remove the camera, but he did approve Mallory's request to turn off the audio function of the camera.  Dkt. # 71-6, at 18-19.  On April 21, 2017, Mallory sent an e-mail to Brad Psajdi, a representative of Omnitracs, requesting that the audio function of the camera in Mousavi's truck be turned off.  Dkt. # 71-8, at 1.

On May 5, 2017, Mousavi was involved in a single vehicle accident in which his tractor-trailer went off the side of a road and overturned.  Dkt. # 71-1, at 4.  Mousavi has offered different explanations for the cause of the accident.  Mousavi told the Missouri highway patrol officer that another truck ran him off the road and his tractor-trailer collided with a culvert on the side of the road.  Id. At his deposition, plaintiff did not recall that another vehicle ran him off the road and he stated that he lost control of his tractor-trailer on a narrow road with no other vehicles present.  Dkt. # 71-2, at 22.  JCT terminated Mousavi's service after the accident, because he was involved in a serious, preventable accident, and JCT would likely face liability for negligent hiring and retention if Mousavi were involved in another accident.  Dkt. # 71-5, at 10; Dkt. # 71-6, at 22.  Upon termination of the independent contractor agreement, JCT provided an owner/operator settlement to Mousavi and the statements reflected that Mousavi had an outstanding balance to JCT.  Dkt. # 71-12.  The cargo in the tractor-trailer at the time of the accident was also condemned and the Missouri

---

[2]     Mousavi inferred that JCT was regularly listening to his voice from Walker's comment that "its funny that they can hear you."  Dkt. # 88, at 86.  However, she did not say that she heard Mousavi's voice more than one time and her deposition testimony clarifies that she heard Mousavi's voice on only one occasion.

highway patrol officer would not allow JCT to deliver the cargo with another tractor-trailer.  Dkt. # 71-13, at 9.  After the accident on May 5, 2017, Mousavi's driver manager, Richard Ates, was questioned by members of JCT management about the camera in Mousavi's tractor-trailer, and Marty Means allegedly stated "[w]ould you be surprised if [Mousavi] was a terrorist."  Dkt. # 88, at 123.  Ates recalls that Jim Gomez, Sr, a senior vice president of JCT, responded that he would not be surprised if Mousavi was a terrorist.  Id.

When Mousavi began working for JCT, he signed an independent contractor agreement with JCT and an equipment lease with Three Diamond.  In the independent contractor agreement, Mousavi agreed to provide "transportation related services" with the tractor-trailer he was leasing from Three Diamond, but the agreement could be terminated by either party with 30 days written notice or immediately if a material breach of the agreement occurred.  Dkt. # 71-3, at 1.  The contractor, Mousavi, was obligated to provide a competent driver and JCT reserved the right to disqualify any driver who did not meet JCT's minimum qualifications.  Id. at 3.  The agreement requires Mousavi to indemnify JCT for loss or damage to the equipment arising out of Mousavi's negligence or breach of the agreement.  Id. at 9.  For claims of personal injury or damage to a third-party's property, Mousavi also agreed to indemnify JCT for up to $1,000 of the amount paid by JCT.  Id.  The equipment lease with Three Diamond provides that Mousavi would pay a weekly rent of $120 plus mileage.  Dkt. # 71-4, at 1.  Mousavi agreed that he would be the driver assigned to the specified tractor provided by Three Diamond unless he became ill, disabled, or unable to drive.  Id. at 3.  If Mousavi believed that he was unable to drive, he was required to provide a substitute driver who was competent to use the equipment.  Id.  Mousavi also agreed to indemnify Three Diamond for claims arising out of his negligence is using or maintaining the equipment.  Id. at 5. Mousavi paid

for physical damage and liability insurance from JCT on his tractor-trailer, and he claims that he has not received any insurance payment or a replacement vehicle after the accident.  Dkt. # 71-2, at 30; Dkt. # 88, at 129-167.  Mousavi testified in his deposition that he did not know how much money Three Diamond owed him for allegedly breaching the equipment lease.

On January 3, 2019, Mousavi filed this case alleging claims against JCT and Three Diamond. Dkt. # 2.  Mousavi alleges that both defendants violated the Electronic Communications Privacy Act, 18 U.S.C. § 2520 (ECPA) (count I) and that defendants terminated his employment because of his race in violation of 42 U.S.C. § 1981 (count II).  Mousavi alleges state law claims for invasion of privacy (count III), negligence (count IV), and breach of contract claims against each defendant (counts V and VI).  JCT and Three Diamond filed a motion to dismiss, and the Court dismissed plaintiff's § 1981 and negligence claims (counts II and IV).  Dkt. # 25.  JCT and Three Diamond filed counterclaims for breach of contract or indemnification.  Dkt. ## 29, 30.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317.  "Summary judgment procedure is properly regarded not as a disfavored

6

procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

Defendants argue that plaintiff consented to the installation of a critical event camera in his tractor-trailer, that they were not aware that the camera would record plaintiff's voice, and that they cannot be held liable under the ECPA or under Oklahoma law for the invasion of privacy.  Dkt. # 71, at 15-18.  Defendants also argue that plaintiff lacked a reasonable expectation of privacy and, in any event, the camera recorded plaintiff speaking in Farsi and the contents of his communication have remained private. Id. at 19.  Plaintiff responds that there are genuine disputes as to defendant's knowledge about the functioning of the camera and the scope of plaintiff's consent, and he asks the

Court to deny defendants' motion for summary judgment on his ECPA and invasion of privacy claims.

## A.

JCT raises three arguments in opposition to plaintiff's ECPA claim.[3] First, JCT argues that it did not know the critical event camera would record audio and it could not have intentionally intercepted plaintiff's speaking voice. Dkt. # 71, at 16. Second, JCT argues that plaintiff consented to the installation of a camera in his tractor-trailer and JCT cannot be held liable under the ECPA. Id. at 17. Finally, JCT argues that the camera recorded only the sound of plaintiff's voice, and the contents of plaintiff's communication have remained private because he was speaking in another language. Id. at 19-20.

The ECPA provides that "any person whose wire, oral, or electronic communications is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity . . . which engaged in that violation . . . ." 18 U.S.C. § 2520(a). A plaintiff must prove that a defendant "(1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication (5) using a device." In re Pharmatrak, Inc., 329 F.3d 9, 18 (1st Cir. 2003). The term "intercept" is defined as the "aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. §

---

[3]    Three Diamond argues that it had no role in the installation of the camera in plaintiff's tractor-trailer and it cannot be held liable under the ECPA. Dkt. # 71, at 15. Plaintiff does not respond to this argument and plaintiff offers no evidence that Three Diamond had any role in the installation of the critical event camera in his tractor-trailer. The Court finds no basis to hold Three Diamond liable under the ECPA, and the Court will consider plaintiff's ECPA claim solely as it relates to the actions of JCT. The same finding also applies to plaintiff's invasion of privacy claim under Oklahoma law.

2510(4).  The ECPA does not apply to silent video surveillance and there must be an audio component for a video recording to qualify as an unlawful interception under the ECPA.  United States v. Larios, 593 F.3d 82, 90 (1st Cir. 2010).

JCT argues that plaintiff consented to the installation of a camera in his tractor-trailer and he cannot recover under the ECPA.  Under 18 U.S.C. § 2511(2)(d), it is not "unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception . . . ."  The evidence is undisputed that plaintiff consented to the installation of a camera in his tractor-trailer, but plaintiff denies that he consented to the recording of his conversations.  Dkt. # 88, at 74-75.  The Court must consider not only whether plaintiff consented to the installation of the camera, but "a reviewing court must inquire into the dimensions of the consent and then ascertain whether the interception exceeded those bounds."  In re Pharmatrak, 329 F.3d at 19-20.  Consent is not "an all-or-nothing proposition," and a party may consent "to the interception of only part of a communication or to the interception of only a subset of its communications."  In re Google Inc., 2013 WL 5423918, *12 (N.D. Cal. Sep. 26, 2013).  JCT simply argues that plaintiff consented to the installation of a camera and that JCT had no knowledge that the camera could record audio, but plaintiff has produced evidence that he specifically did not consent to the recording of audio communications.  Dkt. # 88, at 74-75.  This evidence suggests that plaintiff gave limited consent to use the camera to record video of events happening outside of his tractor-trailer, but there is a genuine dispute as to whether plaintiff consented to audio recording inside the cab of his truck.

JCT argues that it could not have intentionally intercepted an audio recording from plaintiff's tractor-trailer, because it did not know that the critical event camera could record audio. Dkt. # 71, at 16. Mallory testified that he heard plaintiff's voice when he was viewing a video from the camera in plaintiff's tractor trailer, and he was not informed when the camera was installed that it would record audio. Dkt. # 71-6, at 5, 12. Crowley also testified that he was not aware that the critical event camera could record audio. Dkt. # 71-5, at 5. However, Psajdl met with Mallory to install and set up the camera in plaintiff's tractor-trailer, and he asked Mallory if JCT wanted the camera to record audio. Dkt. # 88, at 61. This was one of the standard questions that Psajdl would ask when setting up a new camera, and he cannot recall which option JCT selected. Id. at 62-63. Psajdl does remember that Mallory later contacted him and asked him to turn off the audio function of the camera, and this supports an inference that Mallory originally selected to have the audio function of the camera turned on when the camera was installed. Id. at 66. The Court finds that there is a genuine dispute as to whether Mallory knew that the camera in plaintiff's tractor trailer could record audio, and this also gives rise to a genuine dispute as to whether JCT intentionally intercepted a recording of plaintiff's voice over the camera.

While there is a dispute as to whether JCT acted intentionally, plaintiff must also show that JCT intercepted the "contents" of an oral communication. The term "contents" is defined in relation to an oral communication as "any information concerning the substance, purport, or meaning of that communication . . . ." 18 U.S.C. § 2510(8). In other words, it is not simply the fact that a defendant intercepted sound or audio, but the defendant must have gathered information about the meaning or substance of the oral communication. In re Zynga Privacy Litigation, 750 F.3d 1098, 1106 (9th Cir. 2014) ("'contents' refers to the intended message conveyed by the communication"); Hill v. MCI

10

WorldCom Communications, Inc., 120 F. Supp. 2d 1194, 1196 (S.D. Iowa 2000) (the capture of electronic signals related to a phone call or identity of a caller is not an interception under the ECPA, because no information about the contents of the call was gathered).

Plaintiff admits that on at least one occasion Walker and/or Mallory heard him speaking in Farsi, but he suggests that it is possible that Walker or Mallory heard his voice on other recordings and that he could have been speaking English. Dkt. # 88, at 9. However, the evidence cited by plaintiff does not support an inference that any employee of JCT heard his voice on more than one recording or that plaintiff was speaking English in a recording. Plaintiff testified in his deposition that Walker approached him near the outdoor guard shack and said "its funny they can hear you." Id. at 78. Walker told plaintiff that she heard him speaking a different language, but Walker made no statement concerning how long she listened to plaintiff's voice or if she had heard his voice multiple times. Id. at 78, 84. Mallory states that Walker came into his office while he was reviewing a recording from the camera and she did not watch the video. Dkt. # 71-6, at 14-15. Walker's deposition testimony is consistent with Mallory's recollection. She testified that she walked into Mallory's office for no more than five or ten seconds to pick up some papers, and she heard plaintiff's voice on a recording. Dkt. # 71-7, at 2. This happened one time and she does not specifically recall what she said to plaintiff about hearing the recording. Id. at 2-3. Plaintiff admitted in his deposition that he was not aware of any person employed by JCT who spoke Farsi. Dkt. # 71-2, at 19. There is also no evidence that JCT disclosed the recording to another person in an effort to have plaintiff's communication translated into English. Plaintiff confronted Mallory about the fact that the camera recorded his voice, and Mallory sent an e-mail to Omnitracs that day directing that the audio function of the camera be disabled. Dkt. # 71-8. Plaintiff inferred from his

11

conversation with Walker that JCT employees had listened to his voice on multiple occasions, and for the purpose of summary judgment the Court will assume that this occurred multiple times.  See Dkt. # 88, at 86.  However, plaintiff's deposition testimony provides no basis to infer that defendants heard him speaking in English.

This case presents a unique circumstance in which an oral communication was intercepted but no information about the contents of the communication was obtained by the party who committed the interception.  The ECPA imposes liability for the interception of the substance or intended message of a communication, but that has not occurred in this case.  It is undisputed that plaintiff was subjectively upset about the fact that Mallory and Walker heard his voice, and the Court is not attempting to minimize any distress that plaintiff suffered as a result of JCT's actions.  The issue before the Court is whether the ECPA imposes civil liability for the interception of a communication when the contents or message of the communication have remained private, and the Court finds that the ECPA does not impose such liability.  Therefore, summary judgment should be entered in favor of JCT on plaintiff's ECPA claim.

**B.**

JCT seeks summary judgment on plaintiff's state law claim of invasion of privacy, because plaintiff consented to the installation of the critical event camera and the functionality of the camera was not highly offensive to a reasonable person.  Dkt. # 71, at 20-21.  Plaintiff responds that JCT lied to him concerning the camera's ability to record audio and the reasons for installing the camera, and a reasonable person would have found it offensive that the camera was constantly recording.

Oklahoma courts recognize the tort of invasion of privacy by intrusion upon a person's seclusion, and this tort has two elements: "(a) a nonconsensual intrusion (b) which was highly

offensive to a reasonable person." Gilmore v. Enogex, Inc., 878 P.2d 360, 366 (Okla. 1994).  This

tort is not available for every intrusion upon a person's privacy, and the Oklahoma Supreme Court

has noted that "[t]here is simply no room in the framework of our society for permitting one party

to sue on the event of every intrusion into the psychic tranquility of an individual."  Munley v. ISC

Financial House, Inc., 584 P.2d 1336, 1338 (Okla. 1978).  An intrusion occurs only when "an actor

'believes, or is substantially certain, that he lacks the necessary legal or personal permission to

commit the intrusive act.'"  Dubbs v. Head Start, Inc., 336 F.3d 1194, 1221 (10th Cir. 2003).  The

Oklahoma Supreme Court has favorably cited Restatement (Second) of Torts § 652B, and the

Restatement broadly describes the types of activities that can constitute an invasion of privacy:

> The invasion may be by physical intrusion into a place in which the plaintiff has
> secluded himself, as when the defendant forces his way into the plaintiff's room in
> a hotel or insists over the plaintiff's objection in entering his home.  It may also be
> by the use of the defendant's senses, with or without mechanical aids, to oversee or
> overhear the plaintiff's private affairs, as by looking into his upstairs windows with
> binoculars or tapping his telephone wires.  It may be by some other form of
> investigation or examination into his private concerns, as by opening his private and
> personal mail, searching his safe or wallet, examining his private bank account, or
> compelling him by a forged court order to permit an inspection of his personal
> documents. The intrusion itself makes the defendant subject to liability, even though
> there is no publication or other use of any kind of the photograph or information
> outlined.

RESTATEMENT (SECOND) OF TORTS § 652B (AM. LAW. INST. 1977).

Plaintiff argues that the camera was recording at all times and it would be highly offensive

to a reasonable person to have his communications monitored.  However, plaintiff knew or should

have known from the information provided to him before installation of the camera that it was

always recording.  The critical event camera was designed to provide JCT footage starting 30

seconds before and 30 seconds after an incident of speeding or hard braking.  Dkt. # 71-6, at 13.

This means that the camera must have been recording before the critical event occured or JCT could not reviewed footage of 30 seconds before the speeding or hard braking.  However, the fact that the camera was recording all the time does not show that JCT was regularly reviewing footage from the camera, and the mere fact that the camera did record all the time does not support an inference that JCT was constantly monitoring the camera.  Plaintiff has produced evidence that a customer could contact Omnitracs and request a video from a certain date and time, but there is no evidence that JCT made such a request.  See Dkt. # 88, at 70.  The testimony of Omnitrac's representative also does not suggest a customer could constantly monitor footage from a camera.  Mallory testified in his deposition that he would review footage when he received notice that a critical event had occurred, and he recalls that viewed three videos recorded by the critical event camera in plaintiff's tractor-trailer.  Dkt. # 71-6, at 9-10.  The fact that the camera constantly recorded does not tend to show that JCT was constantly monitoring plaintiff while he was in his tractor-trailer, and the evidence shows that JCT viewed footage from the camera in limited instances when a critical event occurred.

Many of plaintiff's arguments concern JCT's alleged misrepresentations or subjective motivations for seeking to have a critical event camera installed in his tractor-trailer, and for the purpose of ruling on a motion for summary judgment the Court will assume that JCT made certain misrepresentations about the purpose for installing the camera.  See Dkt. # 88, at 22-23.  However, the focus of the Court's analysis is whether the intrusion itself was objectively offensive to a reasonable person, and JCT's subjective motivations will not necessarily make the intrusion unreasonable or offensive.  The critical event camera recorded footage constantly but JCT only viewed the footage 30 seconds before and 30 seconds after an incident of speeding or hard braking.  Mallory and Walker heard plaintiff's voice on at least one occasion, but he was speaking Farsi and

they could not understand what plaintiff was saying.  Plaintiff requested that Mallory remove the camera or turn the audio function off, and that same day Mallory contacted Omnitracs to ask that the audio function of the camera be turned off.  Plaintiff argues that the cab of the tractor-trailer was a private space where he worked, ate his meals, and took personal phone calls, and he suggests that the space should be treated as if it were his home. Dkt. # 88, at 21.  However, both defendants also had a substantial interest the tractor-trailer, and plaintiff's evidence shows that his loan balance on the tractor-trailer was $149,385.61 at the time of the accident.  Dkt. # 88, at 165.

In an employment case, Oklahoma courts balance the privacy interests of the employee against the legitimate interests of the employer that support the intrusion.  Gilmore, 878 P.2d at 366-67 (mandatory drug testing by employer was nonconsensual but was not highly offensive in light of the employer's legitimate reasons for the testing).  The parties dispute whether plaintiff consented to the installation of the camera, and there is a genuine dispute concerning the scope of plaintiff's consent.  However, the Court does not find that the intrusion in this case was highly offensive to a reasonable person, and plaintiff cannot establish an essential element of his invasion of privacy claim.  The critical event camera did constantly record but the recordings were only viewed by JCT on the limited occasions when a critical event occurred.  Mallory heard plaintiff's voice on at least one recording, but he could not understand what plaintiff while he was speaking Farsi.  Mallory immediately asked Omnitracs to disable the audio function of the camera after plaintiff complained that the camera recorded his voice.  JCT had a legitimate interest in ensuring that drivers were not misusing an expensive piece of equipment with the potential to cause serious harm to third-parties, and the limited intrusion on plaintiff's privacy is not highly offense under objective standard,

especially in light of JCT's legitimate interests.  The Court finds that JCT is entitled to summary

judgment on plaintiff's invasion of privacy claim.[4]

**C.**

Plaintiff has asserted breach of contract claims against JCT and Three Diamond, and JCT and

Three Diamond have asserted counterclaims for breach of contract against plaintiff.  Defendants seek

summary judgment as to plaintiff's breach of contract claims and they request summary judgment

as to liability on their breach of contract counterclaims against plaintiff.  Dkt. # 71, at 22-26.

Plaintiff responds that defendants were responsible for the single-vehicle accident on May 5, 2017,

and defendants breached their contracts with plaintiff by failing to pay him insurance proceeds under

a physical damage policy he paid for through JCT.  Dkt. # 88, at 23.  As to defendants'

counterclaims, plaintiff argues that defendants are not entitled to indemnification when they caused

the accident, and the independent contractor agreement limits his liability to JCT to no more than

$1,000.  Id. at 27.  Plaintiff also argues that he should be treated as an employee under the laws of

his home state, California, and business-related losses caused by an employee are generally the

responsibility of the employer.  Id. at 28.

Plaintiff argues that defendants breached the independent contractor agreement and the

equipment lease by failing to provide him insurance proceeds or a substitute tractor-trailer after the

accident.  Dkt. # 88, at 23.  He also claims that defendants have failed to cite any specific contract

language or regulation supporting his termination.  Under Oklahoma law, "[a] breach of contract is

---

[4]     Plaintiff argues that defendants' tortious conduct "caused" the May 5, 2017 accident by
causing him "extreme" emotional distress.  Dkt. # 88, at 26.  Based on the Court's rulings
in this Opinion and Order, defendants are not liable to plaintiff under the ECPA or Oklahoma
tort law, and the Court rejects plaintiff's argument that defendants can be deemed legally at
fault for the accident.

16

a material failure of performance of a duty arising under or imposed by agreement." Lewis v. Farmers Ins. Co., 1983 OK 100, ¶ 5, 681 P.2d 67, 69.  The three elements of a breach of contract claim are "1) formation of a contract; 2) breach of the contract; and 3) damages as a direct result of the breach." Digital Design Grp., Inc. v. Info. Builders, Inc., 2001 OK 21, ¶ 33, 24 P.3d 834, 843. Crowley testified in his deposition that a driver who pays for physical damage insurance from JCT and maintains his employment with JCT after an accident receives a loaner tractor-trailer while the driver's vehicle is being repairer. Dkt. # 88, at 107-08.  In the case of a driver who is terminated after an accident, the driver is no longer responsible for lease payments or other financial obligations, but the driver does not receive insurance proceeds or a replacement vehicle. Id. at 109.  The evidence is undisputed that plaintiff's employment was terminated after he was involved in a single-vehicle accident that defendants deemed a "very bad preventable accident."  Dkt. # 71-6, at 22. Defendants argue that plaintiff actually owes them money and he is in breach of the independent contractor agreement and the equipment lease.  Defendants cite the indemnification provision of each agreement and argue that plaintiff is obligated to reimburse them for amounts that they were required to pay because of his negligence.

Plaintiff's claim for breach of contract is based on his belief that he is entitled to insurance proceeds following his accident, and this claim would be limited to his contractual relationship with JCT.   Dkt. # 71-2, at 30; Dkt. # 88, at 23-24.  He testified in his deposition that Three Diamond does not owe him any money, and his response to defendant's motion for summary judgment also suggests that he has abandoned his breach of contract claim against Three Diamond.[5]  Dkt. # 71-2,

---

[5]     The equipment lease with Three Diamond requires plaintiff to obtain insurance on his tractor-trailer, but it is the independent contractor agreement with JCT that actually provides the insurance.  Dkt. # 71-3, at 8, 28-29; Dkt. # 71-4, at 6.

at 26-28.  Therefore, it appears that plaintiff is proceeding with a breach of contract claim against JCT only.  Plaintiff asserts that he is owed insurance benefits but he acknowledges that he does not know the specific terms of the alleged insurance policy and he has not provided a copy of the insurance policy.  Dkt. # 88, at 23-24.  He cites Crowley's deposition testimony for the proposition that the insurance policy offered by JCT will provide a driver a replacement vehicle and "make the contractor" whole in the event that a tractor-trailer is totaled.  Id. at 23.  However, this argument is based on part of Crowley's deposition testimony, and Crowley did not testify that a driver who was terminated after an accident would receive a replacement vehicle.  Instead, the terminated driver would no longer owe any outstanding amounts on his equipment lease, but he would not receive a new tractor-trailer or an insurance payout.  Dkt. # 88, at 109.  The evidence provided by plaintiff does not show that he was entitled to any insurance payment or a replacement vehicle.  In fact, defendant has produced evidence that plaintiff had an outstanding balance on his escrow account with JCT at the time of his termination.  Dkt. # 71-12.

Defendants also argue that summary judgment should be entered in their favor as to their counterclaims for breach of contract.  Plaintiff's response (Dkt. # 88) asserts various arguments on the general theme that he was not negligent, and that defendants should be responsible for the accident for causing him emotional distress.  Dkt. # 88, at 23-26.  The Court has rejected plaintiff's claims that JCT unlawfully intercepted his communications or invaded his privacy, and plaintiff has provided no explanation or excuse for his involvement in single-vehicle accident on May 5, 2017.  Plaintiff's actions caused significant damage to the tractor and trailer he was driving, damaged the fence of a property owner, and resulted in the condemnation of the cargo.  Plaintiff argues that defendants' damages may be limited due to insurance proceeds received by defendants as a result

of the accident, and the independent contractor agreement does contain provisions limiting plaintiff's liability in the event of damage to the property of third parties, cargo, or trailer.  Dkt. # 71-3, at 9. Plaintiff also argues that he should be treated as an employee of JCT, rather than an independent contractor, and this could dramatically change the parties' relationship for the purpose of the pending breach of contract claims and counterclaims.  The Court finds that it would be premature to rule on the viability of plaintiff's breach of contract claim against defendants or defendants' breach of contract counterclaims until the issue of plaintiff's employment status is resolved in Huddleston. An employee's liability to an employer for an accident occurring within the scope of employment is substantially different than an independent contractor's liability arising out of a contractual agreement, and defendants' motion for summary judgment is denied as to the breach of contract claims and counterclaims.  However, the Court may allow plaintiff and defendants to file a supplemental motion for summary judgment as to the breach of contract claims and counterclaims once the issue of plaintiff's employment status is resolved.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment and Brief in Support (Dkt. # 71) is **granted in part** and **denied in part**: the motion is granted as to plaintiff's ECPA and invasion of privacy claims (counts I and III) but the motion is denied as to plaintiff's breach of contract claims (counts V and VI) and defendants' breach of contract counterclaims.

**DATED** this 16th day of September, 2020.

_____

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

19